H. J. SIMON, APPELLANT, VS. M. LEVY, APPELLEE.

FRAUD—ESTOPPEL TO ASSAIL.

Where a debtor makes a fraudulent sale of a stock of goods to defeat his creditors, a creditor who, after acquiring knowledge of such fraud, acquiesces therein, and takes no steps to impeach it, but, on the contrary, goes into partnership with the fraudulent vendee for the purpose of carrying on trade with such goods, treating the sale of such stock to such vendee as being valid, thereby inducing such vendee to alter his position by purchasing new goods from time to time to replenish said stock and to carry on the business, such acquiescing creditor will be estopped from afterwards questioning or assailing such fraudulent sale as against such vendee, though he was no party to the fraud in its incipiency. The law will not undertake to rectify one fraud by aiding a party in the perpetration of another fraud.

Appeal from the Circuit Court for Escambia county.

The facts in the case are stated in the opinion of the court.

*John C. Avery*, for Appellant.

*Blount & Blount*, for Appellant.

TAYLOR, J.:

M. Levy, the appellee, on the 29th day of March, 1889, instituted his suit by attachment in the Circuit Court of Escambia county against Jacob Simon and

Louis Simon, as former copartners under the firm name of Simon & Co., the sole ground of the attachment as laid in the affidavit therefor being that the defendants were non-residents of this State. The writ of attachment was levied by the sheriff upon a lot of clothing and gentlemen's furnishing goods in a store in Pensacola. The appellant, H. J. Simon, interposed a claim to the goods levied upon, making the requisite oath of ownership and giving the required bond. Levy, the plaintiff in the attachment suit, succeeded in recovering judgment against Simon & Co., on the demand sued upon, prior to the trial of the claim case of H. J. Simon. The result of the trial of the claim case was also in Levy's favor, the verdict of the jury being adverse to the claimant, and from the judgment thereon the appellant claimant takes this appeal.

After the jury had retired to consider of their verdict, they returned into court and through their foreman propounded to the court the following questions: "If we are satisfied that Mr. Levy had a knowledge of the sale to Steele & Co. and from Steele & Co. to H. J. Simon, if he was cognizant of these sales, and we determine that they were fraudulent, is he a participant in the fraud?" To which request for further instruction the judge responded with the following charge: "He must participate in bringing them about—in bringing about these sales and transfers, and have a knowledge of them; but if he had no knowledge of these sales—those sales that were made from Simon & Co. to Steele & Co. and from Steele & Co. to H. J. Simon, and if he did not participate in bringing them about before they were made, he would not be a party to the fraud." This charge was excepted to, and is the first error assigned. The discussion of this assignment of error involves a consideration of the facts in

proof. From the proofs it appeared that the claimant, H. J. Simon, was a first cousin of Louis Simon, and a brother to Jacob Simon, who composed the firm of defendants in the attachment suit of Simon & Co. That said firm resided in Mobile, Alabama, where they conducted their main business, but that they also conducted the branch store in Pensacola, Florida, that was in charge of M. Levy, the plaintiff in attachment, as their employe. That on or about the first of December, 1887, said firm failed in business and made a general assignment for the benefit of their creditors of their Mobile property, and at or about the same time executed a bill of sale of their Pensacola store and stock to Louis Steele, of Baltimore, Maryland, the cousin of all three of the Simons. This bill of sale to Louis Steele, doing business as Louis Steele & Co., was dated November 30th, 1887, and the consideration expressed therein is that it was to be in payment of $2,000 of the indebtedness of the vendors to said Louis Steele & Co. That an inventory of the goods in the Pensacola store, hurriedly taken at the time or shortly after this bill of sale, showed their value to be $2,700. The plaintiff testifying that this was an under valuation; that their real value was between $3,300 and $3,400, and that an inventory of them carefully taken by himself and the claimant in January, 1888, about a month after the bill of sale to Steele & Co., showed their value to be $3,342.20, which was their value at the time of the bill of sale to Steele & Co. That prior to the failure of Simon & Co. H. J. Simon, the claimant, used frequently to come over to Pensacola from Mobile and direct the Pensacola branch of the business, as though he were one of its proprietors. Louis Steele testified that prior to the execution of the bill of sale to him he was not consulted in reference to

same and knew nothing of any intention to make it until he received the bill of sale itself. That he knew nothing of the Pensacola stock, its size or value. Besides this bill of sale, Steele received from the assignee of the Mobile property some *pro rata* payments upon the indebtedness due from Simon & Co. The plaintiff also testified that H. J. Simon was in Pensacola when he heard of the failure and assignment of the firm of Simon & Co. That the night before informing them of the failure he asserted that he was going home to Mobile, but next morning he was still in Pensacola, and came briskly into the store saying the boys (meaning Simon & Co.) had "gone up," and made an assignment, and that he would take charge of the business in Pensacola in the name of Steele & Co. The plaintiff Levy testified further that he had his suspicions of these transactions all along, but said nothing. That H. J. Simon at once asked how much money he had on hand, and he told him $13.50. Upon which H. J. Simon told him to take that $13.50, as he did not want any cash carried away, and gave him the money, making no charge against him on the books for it, and that H. J. Simon told him to stay right there and make himself easy, that he would be all right; that he intended to give him a showing there. The testimony further shows that in January (the day of the month not being given), A. D. 1888, Louis Steele & Co., for an expressed consideration of $3,000, made a bill of sale of the Pensacola stock to H. J. Simon, which consideration Steele swears was paid him by H. J. Simon therefor.

On the 19th of January, 1888, H. J. Simon, the claimant, and M. Levy, the plaintiff in attachment, entered into a written agreement in which it was recited that by a careful and correct inventory taken on

that day, of the stock of goods purchased by H. J. Simon from L. Steele & Co., there was found to be $3,342.20 worth, and that in consideration of the services to be rendered and interest to be taken by Levy in conducting the said business, that at the expiration of said contract an inventory of the stock should be taken at cost, and that after the necessary and current expenses of conducting the business was deducted and all outstanding debts of the firm paid, then the said Levy should be entitled, as his interest in the said business, to one-third of the profits that may have arisen from the same. The duties of said Levy, prescribed by said agreement, were that he should give his steady attention to the business, and that he should not engage in any other business or occupation during the continuance of said contract, which, by its terms, was to expire on December 1st, 1888. H. J. Simon, by said contract, was to attend to the purchasing of merchandise necessary from time to time, and to attend to the settling of all bills incurred by the firm, which, from the date of the agreement, was to be conducted in the name of H. J. Simon. The prooffs show that under this agreement Levy went into the store, and was there constantly, and ran the business, and bought goods for it until it was closed out by his attachment. The claimant testified, without contradiction, that about the last of March, 1889, he came over to Pensacola in order to settle up with Levy, as said written agreement between them had been extended to April 1st, 1889. That they took stock, and found that they had lost money in the business. Levy had drawn more money than he was entitled to as his profits in the business; he owed me about $1,000, and on his asking Levy at the time what settlement he was going to make, he replied that he did not have any money, and

could not settle, but wanted to buy the stock for him-self, to which the claimant replied that he needed all the money he could get, and would have to sell for cash; and that on the afternoon of the same day, without any warning to him, Levy had the attachment levied on the stock. H. J. Simon testified further that upon the execution of the bill of sale from Simon & Co. to Louis Steele & Co. he took charge and posses-sion of the store for them as their agent, and at once notified M. Levy that he was now in the employ of Steele & Co., and that he kept right on in the store, making no objection at all. It also appeared in proof that the claimant, H. J. Simon, purchased the property in Mobile of Simon & Co. from their assignee, and after-wards conducted business there as H. J. Simon & Co., and that H. J. Simon had full cherge, possession and control of the Pensacola stock for Steele & Co. from the time of the bill of sale from Simon & Co. to them until the bill of sale to H. J. Simon from Steele & Co. The proof shows further that during the time of the agreement between Levy and Simon to conduct the business in Pensacola together upon a remuneration to Levy of a third of the profits for his services, the stock was replenished from time to time by purchases of new goods made by both Levy and H. J. Simon. The proof further shows, by the testimony of Levy himself, that upon his own suggestion and advice, af-ter the bill of sale to Steele & Co. had been executed, $700 worth of goods were clandestinely taken out of the Pensacola store, and were carried around to Levy's dwelling house and were there concealed and kept un-til after Steele died, when they were returned to the store, and that the object of this was to prevent other claims from seizing them. Under these facts in proof, the charge of the court excepted to was erroneous.

By it the jury was instructed, as matter of law, that unless Levy participated in *bringing about* the transfers of the property of Simon & Co. to Steele & Co., and by the latter to H. J. Simon, *before they were made*, he would not be a party to the fraud, if there was any, and, in effect, consequently, that his attachment would hold good as against the claim of H. J. Simon. Although Levy may not have participated at all in the transfers of the property by Simon & Co. to Steele & Co., and by the latter to H. J. Simon *at the time that such transfers were made*, yet after acquiring knowledge that they had been made, and that they were fraudulent, he took no steps to impeach them; but, on the contrary, afterwards became a party with the vendees under those transfers to transactions and instruments proceeding on the assumption of their validity, then, the law is well-settled, he would be estopped, by his acquiescence in the fraud, from questioning it or assailing it. Oliver vs. King, 8 DeG., M. & G. 110; Pell vs. Tredwell, 5 Wed. 661: Scholey vs. Worcester, 6 N. Y. Supreme Court (Thompson & Cook), 574; Butler & Alford vs. O'Brien, 5 Ala. 316; Bobb vs. Woodward, 50 Mo. 95; Jenness vs. Berry, 17 N. H. 549.

We recognize fully the soundness of the rule as laid down in Powell vs. Rogers, 105 Ill. 318, cited by counsel for appellee, that the doctrine of estoppel *in pais*, or equitable estoppels, is based upon a fraudulent purpose and a fraudulent result. That if the element of fraud is wanting, there is no estoppel, as, if both parties are equally cognizant of the facts, and the declaration, acts or silence of the one party produces no change in the conduct of the other, he acting solely on his own judgment. That there must be deception, and change of conduct in consequence thereof, to

estop a party from showing the truth.   But we think
the facts in proof here tend strongly to bring the ap-
pellee, Levy, completely within the rule as it is an-
nounced in the illinois case.   He testified himself that
he knew or suspected all along that these transfers by
which H. J. Simon became the ostensible owner of the
property were wrong, yet he acknowledges that he not
only kept silent, and took no steps to impeach them,
but participated in the fraud, if there was any, by sug-
gesting and consummating a clandestine concealment
of a part of the property at his own dwelling house
for the avowed purpose of completely removing it be
yond the reach of creditors, and then, proceeding
upon the assumption that H. J. Simon was the
*bona fide* owner of the property, he enters into a writ-
ten agreement with him by which he, as a considera-
tion for his personal services in the sale of the prop-
erty to consumers, was to receive for himself one-third
of the profits to be made out of such sales thereof.
Under this agreement he continued for more than a
year to dispose of this property to consumers, where
it could never be reached for the debts of the original
firm of Simon & Co.; and during all that time, by his
silence and by his daily actions encouraged and pro-
cured the replenishment of the stock with new goods
purchased by H. J. Simon. Under these circumstances,
in the light of the proofs before us, we think he was
estopped from assailing, when he did, the *bona fides*
of the transfers by which H. J. Simon became pos-
sessed of the goods as owner thereof.   It was error,
therefore, for the court to instruct the jury that unless
he participated in bringing about the transfers at the
time they were made, he would not be a party to the
fraud.

The second error assigned, the refusal of the court.

to grant a new trial on the ground that the verdict was contrary to the evidence and to law, is practically disposed of in what has been said.

The judgment of the court below is reversed and a new trial awarded.